Bradford *vs.* Jones.

# A. W. BRADFORD *against* JONES, Trustee, FOLEY and WOODSIDE.

There is nothing in the act of 1841, chapter 271, repugnant either to the old or the new Constitution. The funds contemplated by that act, may certainly be taxed for general purposes. A fund thus raised by taxation, can be as well applied by the legislature to the payment of the salary of a judge, as to defray any other expense of government. The act of 1841, aforesaid, is but the exercise of a power vested in the legislature by the old Constitution, of regulating and increasing the salaries of the judges, and providing the means of paying them.

This act of Assembly is warranted by very many laws, passed at different times, commencing many years ago, and making a similar provision for the chancellor, judges of the general court, of the Court of Appeals, and the county courts. This long and uniform interpretation, ought to remove any doubt which might be entertained, in regard to the constitutionality of this act of Assmbly.

The new Constitution provides that the judges then in office, should continue in office, until their successors shall qualify. The effect of this provision was to continue the salaries of the then judges, so long as the State received their services. The salaries allowed by the new Constitution, are payable to the judges appointed under it, and not to the old judges.

Bradford vs Jones.

The act of 1849, chapter 354, revived the act of 1841, if it expired 1st January 1850.

The title of an act of Assembly is no part of it, but may be resorted to, in order to show the intention of the legislature.

The act of 1841, imposes a tax of one per cent. upon all moneys thereafter deposited in Baltimore county court, or coming into the hands of trustees or other officers of said court, for distribution under its orders or authority, which is to be paid over to the clerk of said court. This sum, thus collected, went to the judges of Baltimore county court, as part of their compensation. When this tax accrued the services had been rendered, and the claim to it had become a vested right; this was a "legislative levy" upon the fund, fixed and determined upon before the judges went out of office, and a delay in stating the account by the auditor or in the payment of the money over to the clerk, cannot affect their right to the tax.

The clerk of the court is but a ministerial officer, under this law, and has not, like the judges, a vested right, to render the service imposed on him. He has no "inchoate" right to commissions for collecting this tax. The clerks of the new court are now to perform the duties of the clerk of Baltimore county court in regard to the collection and disbursement of the fund arising from this tax. The allowance, therefore, to the clerk of the late county court, the court of common pleas was right in rejecting.

The design of the law of 1849, ch. 88, sec. 4, which confines the Court of Appeals, in cases of insolvency, to the points raised in the court below.

THE statement of this case, prepared by the counsel for the appellant, is so full and correct, as to render any addition or alteration unnecessary.

The questions presented by this appeal arose upon the following case:

James Jones was an applicant for the benefit of the insolvent laws of Maryland, at four several periods, to wit: in 1836, 1846, 1848, and in 1850. And there having been no appointment by the commissioners, of a permanent trustee, under any of these applications, T. M. Lanahan, Esq., was, by Baltimore county court duly appointed the permanent trustee of said Jones under the first of said applications, that of 1836, and duly qualified as such. On the 17th *November* 1851, the said trustee, Lanahan, made his report to Baltimore county court, and in which he reports, that on or about the 1st *March* 1850, the said insolvent became entitled, under the will of his brother, to the sum of $1,051.61, which he, the trustee,

says he has received and has in hand for distribution, but does not state the period of its receipt.

Of that report there was *a confirmation nisi by Baltimore county court on the 17th November* 1851 ; and on 16th December 1851, the proceedings in the application to which said report related, were, at the instance of T. P. Scott, Esq., as attorney of some of the creditors, and on the application of the clerk of the court of common pleas, transmitted by the clerk of the superior court of Baltimore city to the court of common pleas for said city, in which latter court the said report was finally ratified.   And thereupon, the auditor of insolvent estates in said court made his report, with the accompanying accounts.   In one of these accounts, account A, *he has charged the estate in the hands of the trustee "with the State tax of 1 per cent. on the amount in hands of the trustee, payable to A. W. Bradford, former clerk of Baltimore county court, act of 1841, chap. 271:"* and to this account the exceptions were taken as to Bradford's claims, by said T. P. Scott, Esq. as attorney of certain creditors of said insolvent.   These exceptions are, "that the said claim of A. W. Bradford, as stated and allowed in account A, ought not to have been allowed, but ought to have been rejected. 1*st.* Because the acts of Assembly, under which said claim is supposed to arise, were and are unconstitutional and void, so far forth as said claim is concerned.   2*nd.* Because if the said acts of Assembly ever had any legal force or validity, yet the time for which they were limited has expired.

The court gave the following opinion :

In the matter of the estate of James Jones, an insolvent debtor.   Court of common pleas.

The exceptions taken on behalf of Foley and Woodside, against the claim stated and allowed in favor of A. W. Bradford, involves questions of such importance and delicacy, that I have thought it due to myself to state my reasons briefly in writing.   I am not of opinion that the laws upon which this claim rests, have expired by their own limitations.   I shall not trace this system of legislation through its intricacies, in

order to show that they should not be considered mere temporary laws. The act of 1849, ch. 354, I think is conclusive upon this question. The act of 1837, ch. 235, continues this system of laws, so far as they were in force, *until* 1850. The act of 1849, ch. 354, passed March 7th, 1850, continues all public acts that would expire *with the then* session of the assembly, until the last Monday of December 1851, and *till* the end of the session of the assembly then to ensue. It is needless to go into a philological inquiry as to the meaning of the word "*with.*" Like all those particles in our language, its discriminating shades of meaning are very nice. I think it may fairly be considered as properly used in the law, as coincident in meaning with the word "*during,*" used in its caption. Considering these laws then as not having expired at the time and in the manner supposed in the exception, and putting aside for the present the constitutional objections to their legal force at any time, I shall inquire whether the claim of Mr. Bradford could be sustained by a just construction of these laws under existing circumstances. The law particularly in question here, is that of 1841, ch. 271. The claim under discussion is the tax imposed by that law. The object of this tax and of the kindred taxes imposed by the system of laws under review, was first, to provide a fund, out of which to pay the increased salary allowed the judges of the sixth judicial district by the law of 1828, ch. 127, and then to increase the compensation of those judges by the surplus in the hands of the clerk, whose duty it was to collect the tax. The courts composing the sixth judicial district, were dissolved on the 1st of December 1851. From that time, of course, so far forth as this question is concerned, the judges of those courts became private citizens. It has not been suggested in this cause, that the full salaries allowed by law have not been paid to those gentlemen, up to the period of their retiring from office, nor is it alleged that any surplus, actually in the hands of the claimant after the payment of those salaries, is here involved. The surplus of all taxes thus collected, up to the 1st of December last, has no doubt

been paid into the hands of the judges, agreeably to the pro-
visions of these laws. The question here is simply, shall
this tax continue to be collected? The courts have ceased to
exist, which the tax was intended to support, and the judges
are private citizens, for whose compensation this tax was de-
signed. There can be but one reason now which can justify
the further collection of this tax. It is, that upon a just and
fair construction of the law imposing it, the judges acquired
a private individual right to one per cent. of all insolvent
estates, at the moment of their being converted into money in
the hands of the trustees. I do not think the laws will admit
of this construction. I think, on the contrary, that the judges
could have no individual rights in the proceeds of this tax,
nor any claim upon the estates subjected to it, until the mo-
ment and under the circumstances when it became due and
payable to them under the rules and practice of the court, and
by the literal provisions of the law; this was a tax to defray
the expenses of the judiciary; it was a public fund therefore,
and every individual claim upon it must be strictly construed.
The proceeds of the tax now claimed must be distributed,
either under the act of 1837, ch. 72, sec. 2, or the act of
1835, ch. 235. The act of 1837, ch. 72, provides, that the
clerk shall, after paying to the treasurer, *quarterly*, the one-
fourth of $2,400, on account of the salaries of the judges pro-
vided for by this law, pay to the judges the surplus, or excess
or excesses, that shall accrue *quarterly*, yearly, or at any time
when such excess shall accrue. It is argued, that this tax
must be deemed to have accrued from the moment the fund
out of which it was to be paid should become liable to taxa-
tion. I think not; there is a wide distinction between the
laying and the collecting of a tax, and surely it is in the
power of a people, at all times, to arrest by law the collection
of a tax they may have imposed for public purposes. This
tax was, therefore, I think, merely authorised and entirely
the subject of legislative control, until the regular administra-
tion of justice under the practice of the court; it should be
paid to the clerk, and he should have ascertained, by deduct-

ing the quarterly payment to the treasurer from the amount in hand, that he held a surplus or excess. The language of the law is not that the tax should have accrued, but the excess should have accrued after the payment to the treasurer. How can a claim thus situated be sustained? An individual, no longer a clerk, claims that a heavy tax shall continue to be collected and paid to him, that he may hand over to the treasurer the salaries of judges of a court which has ceased to exist, and pay over to the gentlemen, who were judges, a large surplus after they have become private citizens. I think this cannot be allowed; nor, in my opinion, does the act of 1835, ch. 235, make the claim under discussion any better in law; that act provides for the payment by the clerk of all his receipts to the treasurer, but still the purpose of the tax, of the clerk's receipts of it, and the payment into the treasury, is to pay the salary referred to, and to enhance the emoluments of the judges of Baltimore county court. This is but the interposition of an additional agent, for conveying into the hands of the late judges a sum of money now, which they would, undoubtedly, have been entitled to receive, had it accrued to the clerk in the regular course of judicial administration, before the court ceased to exist. It is argued, that the failure of the purpose does not avoid the tax. It does not under all circumstances certainly. But I think a court of justice would not be authorised to direct the continued collection of a tax upon funds under its control, claimed in the manner and for the purposes herein set forth.

A failure of the purpose may, and sometimes must, avoid the tax, else why should a tax for an illegal or unconstitutional purpose be void? and I presume there is no doubt that a law imposing a tax specifically for an unconstitutional purpose, would be unconstitutional and void. The second objection to this claim is, that the law imposing the tax claimed was unconstitutional and void. If I am right in the principles I have endeavored to express in reference to this claim already, it is of no practical importance what may be thought of the unconstitutionality of these laws. These laws have

Bradford *vs.* Jones.

been long acquiesced in under the former constitution of the State, and it would seem a gratuitous criticism upon past legislative action to express an opinion upon its constitutionality under such circumstances; except that the construction of the present constitution is equally involved in the issue with that which has just been superseded. The 30th section of the former bill of rights, directed that liberal salaries should be *secured* to the judges, and that no judge should receive *fees* or perquisites of any kind. The 9th section of the 4th article of the new constitution, declares that no judge of any court in this State shall receive any perquisites, fee, commission or reward, in addition to his salary, for the performance of any judicial duty. These provisions are substantially the same, and it is important and proper at an early period, under the new constitution, that the courts should determine by construction of this instrument, whether the compensation of the judges under it, may be increased by the imposition of heavy special taxes, applicable to the payment of their salaries, and in the event of an excess, to the enlargement of their receipts. I think such a system of contingent reward cannot be adopted under our present constitution, and of course, I am of opinion, that so far forth as the surplus or excess of these taxes beyond the additional salary of eight hundred dollars, is in question, the provisions of these laws were violative of the old constitution, and are incompatible with the existing one. I have no doubt that the existing constitution controls the present question, and that in virtue of the 8th section of its 10th article, Baltimore county court was from the 4th of July to the 1st of December 1851, temporarily, but absolutely, a part of the system established by the recent convention of the State. I shall therefore sustain the exception to this claim. 1st. Because the tax was imposed for a specific local purpose; that purpose is made impossible by law, and the agent or trustees can have no right to the fund. 2nd. I think the purpose was unconstitutional, and that the law therefore was void, even whilst the object had such an existence as to admit of a possible execution of the law.

Whereupon the said Augustus W. Bradford, late clerk as aforesaid, prays an appeal from so much of the said order as allows the exceptions to, and overrules the claim of him, the said Augustus W. Bradford, as audited.

From that decision the present appeal was taken.

The case was argued before ECCLESTON, TUCK and MASON, J.

By *McMahon* and *Alexander* for appellant, and *Scott* for the appellee.

On the part of the appellant, the following points were submitted and insisted upon:

*1st Point.* That the said act of 1841, chap. 271, as well as the acts of 1835, chap. 235, and 1836, chap. 133, whose provisions were in part repealed and superseded by those of said act of 1841, and the act of 1830, chap. 159, are, on their face, and by the terms and character of their enactments, *permanent* acts. That being thus permanent on its face, and by the nature of its enactments, the said act of 1841 was not rendered a *temporary* act, merely because it is, by its *title*, supplementary to a temporary act, and especially not, when its provisions are not so connected with, or dependent on those of the act to which it is styled supplementary, as to render the existence and operation of the latter essential to those of the former: nor as a permanent act, could the mere continuance of it to a given period by another statute operate as a repeal of it after that period; that the connection of several statutes, by their relation on the same subject matter, is more intimate and influential than their connection by title merely: and that even where there is such a connection by subject matter between several statutes, the expiration or repeal of one of them does not, *of itself*, determine the existence of the other, which are permanent or unrepealed, unless in cases where the provisions of the latter cannot be enforced, without the enactments of the expired or repealed statute; and lastly, that even if said act of 1841, were admitted to have been

thus made a temporary act, it was continued and was in force, by virtue of the act of 1849, chap. 354.   9 *Bacon's Abridgment, (Louvier's edition,)* 223.   *Ex-parte Gallilee*, 7 *Durnford and East.*, 673.   *Dwarris'*, 9 *Law Lib.*, 28.   1 *Har. and John.*, 550.   7 *Gill and John.*, 274, and 12 *Gill and John.*, 17, 18.   9 *Bacon's Abridg.*, 227.   And for the continuing acts of 1828, chap. 161:   See acts of 1834, chap. 88; 1837, chap. 235, and 1849, chap. 354.   4 *Gill and John.*, 152, and the authorities there collected.

*2nd Point.* The second point, relates to the constitutionality of the said act of 1841, chap. 271, as tested by the constitution of Maryland, as it existed at the period of the passage of said act, and until superseded by the present constitution.

The objects of the legislation, of which this act of 1841 was a part, were to increase the salaries of the judges of Baltimore county court, and to create a fund, for the payment of such increased salary, by a State tax, on process of, or proceedings in the court, or on funds passing through the court. For this purpose, the acts of 1835, chap. 235, and 1836, chap. 233, imposed a tax of two per cent., to be paid by the trustees of insolvent debtors on all sums on which they received their commissions : but these provisions were superceded by those of the said act of 1841, which enacts, that in lieu of it, "there shall be, and is *hereby* imposed, on all moneys, thereafter to be deposited in Baltimore county court, or coming into the hands of trustees, or other officers of said court, or persons, for distribution, under its order or authority, one per cent., to be paid to the clerk of said court, and to be by him, accounted for and paid over," &c.   And the constitutional objection to this act, under the *old* constitution, if rightly apprehended, is, that it violates the provisions of the 30th article of the bill of rights, which, after declaring "that the independence and *uprightness* of judges, are essential to the impartial administration of justice, and a great security to the rights and liberties of the people," secures their continuance in office during good behavior, directs the legislature, as to the salaries to be received, and then provides, "that no chan-

cellor or judge, ought to hold any office, civil or military, or receive fees or perquisites of any kind." And it is assumed, that this act of 1841, does violate that article, either because it increases their salaries, or does it by the allowance of fees or perquisites.

Affirming the constitutionality of this act of 1841, the counsel for the appellant will maintain:

1st. That nothing but a clear and manifest repugnancy, between said act and the constitution, which leaves no well-founded or rational doubt, as to the unconstitutionality of the act, will be decisive against its validity. 12 *G. & J.*, 438. 4 *Dallas*, 18 *and* 19. 6 *Cranch*, 138. 12 *Wheaton*, 270, 294. 9 *Gill and John.*, 383. 16 *Pick.*, 95.

2nd. That the only power, exerted by the said act of 1841, was to provide a fund, for the increase of the salaries of the judges of Baltimore county court, by a tax on funds in court, or coming into the hands of its officers, in order to distribution under its order: and, that if even such a tax, for such a purpose, could be regarded as giving to the judges of said court, *fees or perquisites*, within the meaning of the said 30th article, still it would not fall, within the inhibitions of that article. That the injunction of said article, "that no judge should receive fees or perquisites of any kind," was not intended as a restriction upon the legislature, or to preclude it from increasing or providing for the salary of the judge, but to preserve the *uprightness* of the judge, by prohibiting him from receiving any fees or perquisites, but such as the law allowed, and that this, its true construction, is made manifest not only by the preamble of the article itself, but still more clearly by the oath correspondent to this obligation, which the judge is required to take under the 52nd article of the constitution: "That he will not, directly or indirectly, receive *any fee or reward for doing his office of judge, but what is or shall be allowed by law.*"

3d. That a tax thus imposed, attaching to the fund as soon as it is deposited in court, or comes into the hands of the trustee, in nowise dependent upon the action of the judge

in the premises, and collected and paid over as directed by the act, is not a fee or perquisite within the meaning of that article.

4th. That if there ever had been any room for doubt as to the constitutional right of the legislature, under the old constitution, to exercise such a power as was exerted in the passage of the said act of 1841, there is enough in the aids to the construction of that constitution furnished by the legislation of the State, during its continuance, to put such doubts to rest. This act of 1841, does but exert the power of *increasing* the salaries of the judges, and of providing a fund for that purpose, by a tax imposed by the law on the funds brought into, or under the control of the court: and the fact that the same, or similar powers, were repeatedly exercised by the legislature under the old constitution, by acts of legislation, beginning immediately or shortly after its adoption, continued for long periods, and never questioned, but always acquiesced in without objection, affords a contemporaneous and practical exposition of the constitution, entitled to the highest consideration, and decisive in cases of doubt or ambiguity. 1 *Bland,* 679, for the legislation as to judicial salaries, and especially before 1785. Acts of 1785, chap. 27; 1792, chap. 76 ; 1797, chap. 71, and 1798, chap. 86, as to the chancellor's salary. General court, 1 *Bland,* 679; 1785, chap. 27, and 1797, chap. 50. Court of Appeals, 1 *Bland,* 679 ; 1785, chap. 27; 1797, chap. 79 ; 1799, chap. 52, and especially as to the county courts, acts of 1790, chap. 33, sections 19th to 22nd ; 1796, chap. 43, secs. 28th to 30th, and 1801, chap. 74, secs. 18th to 21st. Act of 1834, chap. 220. 1 *Gill and John.,* 248, 385. 2 *Gill,* 19, 497. 1 *Cranch,* 309. 12 *Peters,* 318. 5 *Mass. R.,* 535, '36. 3 *Pick.,* 518.

5th. That the new constitution itself, by a contrast of its provisions, and especially its new and additional provisions in relation to the salaries or compensation of the judges to be elected under it, with those of the 30th article of the bill of rights in the old constitution, affords further and conclusive

evidence, if more were wanted, that the said 30th article was not intended as a restriction upon legislative power, and especially did not inhibit such legislation as is embodied in the said act of 1841. *New constitution. Bill of rights, article 30th; and constitution, article 4th, sections 4th and 9th, and especially the 9th.*

*3rd Point.* The 3rd point relates to the effect of the new constitution upon the said act of 1841, assuming that act to be constitutional and in force at the period of the adoption of said constitution.

And under this point, it will be maintained, that the new constitution, in its several provisions as to the salaries or compensation of the judges, &c., had relation only to the judges to be elected under it, and did not, and was not intended to affect, regulate, or take away, any part of the salaries or compensation of the judges of Baltimore county court, who were to be superseded by the judges elected under it: that from the very nature and objects of the instrument, as well as its provisions, continuing these judges in office, until their successors were elected and qualified, it was not intended to affect their salaries or compensation, as regulated by the constitution and laws, under which they accepted and held office at the period of its adoption: that it could not accomplish that end, in their cases, except by an *implied* repeal of the said act of 1841, which is disfavored, and never allowed, except in cases of plain and unavoidable repugnancy: and is not necessary, in this case, to avoid such repugnancy, or to give effect to the provisions of said new constitution, as to judicial salaries or compensation.

And lastly, it will be maintained, that the only provision in that constitution, which, it is alleged, accomplishes this repeal, and renders the payment of the tax unconstitutional, is shewn by its terms and context not to have relation to the said judges of Baltimore county court: that provision is found in the 9th section of the 4th article of the constitution, which relates to the judges of the circuit court thereby established: and which, speaking of them, enacts, "and the

Bradford *vs.* Jones.

*said* judges shall each receive a salary of $2,000 a year: and the same shall not be increased or diminished during their continuance in office : and no judge of any court in this State shall receive any perquisite, fee, commission, or reward, *in addition thereto*, for the performance of any judicial duty. And this clause it will be maintained, manifestly has reference by the words, *"in addition thereto,"* only to the circuit judges and their salaries of $2,000, previously established, or at all events, has no relation to any judges but those whose salaries are established by that instrument : and also that the tax in this case does not fall within the provision, even if it were applicable.

*4th Point.* This point relates to the supposed expiration or cesser of the purposes for which the tax was imposed by the said act of 1841, and the right of the court, for that cause, to reject the appellant's claim to the tax.

If the act of 1841 was unconstitutional, or has been impliedly repealed by the new constitution, then the enquiry under this point is immaterial. But assuming that the said act was not unconstitutional and has not been repealed, the enquiry then arises as to the right of the court to refuse the enforcement of it, merely because the tax, when paid to the clerk, as a State tax, under the express injunction of a State law, is to be by him paid over, under the authority of that law, for purposes and objects declared by the law, which, it is assumed, can no longer be carried out, because the officers are no longer in existence for whose ultimate benefit the tax was collected.

And under this point it will also be maintained, that the mere inability of the State, after it had received the tax, to carry out the purposes for which it was imposed, even if conceded, could not operate as an implied repeal of the said act, or warrant the court in refusing the enforcement of it; and that even if it were so, there was nothing in the case to justify the assumption, that the purposes of the act had been entirely accomplished, as far as their accomplishment was practicable.

And it will also be maintained, that the said act of 1841 operated as a *legislative levy* of the tax of one per cent. upon

the fund in the hands of the trustee as soon as it came into his hands; that it was from that period a *vested* right of the clerk, intended for the ultimate benefit of the judges of Baltimore county then in office, which bound the trust in the hands of the trustee, and required no further action of the law or of the court to create or vest the right; and that being thus vested, the mere delay in the distribution of the fund, until the said clerk or judges had gone out of office, could not take away or impair that right; and, as in this case, the funds were not only received by the trustee before the said clerk and judges went out of office, but were actually reported *as on hand*, by said trustee to the said judges of Baltimore county court, and the report by them provisionally confirmed whilst they were still in office, the appellant's title to the tax was then consummate, and the court below erred in refusing the allowance of it.

And lastly, that the exceptions to the account present no such question, but only those relative to unconstitutionality or expiration of the said act of 1841. *State vs. Mayhew*, 2 *Gill*, 497 and '98.

*T. P. Scott* for the appellee, submitted the following points and authorities:

*1st Point.* That the act of 1841, ch. 271, and the system of which it is a part, are unconstitutional, so far as the proposed tax therein mentioned, is concerned.

Under this point the appellees will reply to the second and third points of the appellant.

The declaration of rights, 1776, sec. 30, declares, that "salaries" ought to be "secured" to the judges, and that no judge ought to receive "fees or perquisites of any kind;" and the amendment of 1804, ch. 55, sec. 1, declares that the "salaries of the said judges shall not be diminished," &c.

Thus a distinction is drawn between "salaries," and "fees or perquisites;" and the "salaries" are not to be *contingent* or *dependent;* and upon an examination of the various laws referred to in the fourth part of the appellant's second point,

we will find, that these distinctions are constantly kept in view. The new constitution, art. 4, sec. 9, and declaration of rights, sec. 30, preserves the provisions and distinctions of the old constitution.

The system of acts of Assembly now under review, commenced with the act of 1828, ch. 161, sec. 8. Additional fees or taxes were afterwards levied by other acts, but we shall here refer only to the acts of 1835, ch. 235, sec. 2, and 1836, ch. 133, and finally, the act of 1841, ch. 271. Under all of these acts, fees or taxes were levied as perquisites, for the use of the judges of Baltimore county court; at first, a *part only* of the amount that might be raised, was to be paid them, 1828, ch. 127; and afterwards the whole amount raised was to be paid them, 1837, ch. 72; but it was *contingent and uncertain in amount*, depending on the extent of litigation, and in certain cases, on the *event of the suit*, as in bills to avoid preferences given by insolvents, and bills for a sale of estates held by parcenors, on the ground that partition could not be made in kind. Shall a judge decide when he is interested in the event of the suit?

Thus we dispose of the third part of the appellant's second point.

In reply to the fifth part of the appellant's second point, and to his third point, we say, that although the old judges, were to hold over and exercise their duties according to their "old tenure," art. 10, sec. 8, yet after the adoption of the new constitution, "no judge of *any* court in this State, shall receive any perquisite, fee," &c., art. 4, sec. 9. This article does not mention the judges of the superior court, the common pleas, or the criminal court of Baltimore, yet if they are not embraced in the general terms of this article, they may receive fees, &c, prohibited to all other judges. Such could not have been the intention of the convention.

We contend that the acts of the legislature under review, although they assume "the garb of law," 1 *G. & J.*, 472, are clearly and manifestly in violation of the constitution, and therefore should "be pronounced nullities by the courts of

justice," and that this court is not "at liberty to regard the devious course" heretofore pursued by the legislature in the matter. 2 *G. & J.*, 278.

We do not think there is any force in the second part of the appellant's second point. If the intention of the constitution was to preserve the *uprightness* of the judges, as we concede, they should not be authorised to increase their fees in the manner indicated.

*Appellee's second point:* The acts of Assmbly under review were temporary, and expired before the said claim is supposed to have accrued. Under this point, we shall reply to the appellant's first point.

1. The act of 1828, ch. 161, sec. 8, which first imposed these taxes, as fees or perquisites for the judges, was temporary, sec. 13, and was continued until February 1840, five years, and to the end of the next session by 1834, ch. 88, and ch. 211, sec. 13, and 1837 ch. 72, sec. 3; and was further continued, *"until* the year 1850," by 1837, ch. 235, when it expired by limitation, *unless* made permanent by 1830, ch. 159, or by 1841, ch. 271, or further continued by 1849, ch. 354. The act of 1828, ch. 127, is part of the system: it was originally dependent upon 1828, ch. 161, for the length of its existence, and it was afterwards continued expressly by the continuing acts of 1834 and 1837 above mentioned.

2. Now the act of 1830, ch. 159, is *expressly* a supplement to 1828, ch. 161, *not only* in its title, but also in sections 1 and 2; and it has been so considered by the legislature in 1834, ch. 88 and ch. 211, sec. 4.

A supplement is part of the original act, and when the original is temporary, the supplement expires with it. 2 *T. R.* 609, *Crosby vs. Arkwright.* 4 *T. R.*, 450, *Duck vs. Addington.* 5 *T. R.*, 417, *Ex-parte Dryden.* 9 *Bac. Ab. Bouvier's Edition*, 223, *Title Stat. D.*

And although the title of an act cannot control the express words of the enacting clause, yet it is to be considered by the court; and all statutes in *pari materia* are to be construed

as one act. 4 *G. & J.*, 90, 91, 128, *Canal vs. Railroad.* 12 *G. & J.*, 431, *State use Washington Co. vs. R. R.*

3. And the same argument will apply to the act of 1841, ch. 271 : in addition to which, the *one per cent.* there imposed is "in lieu" of the two per cent. imposed by 1835, ch. 235, and 1836, ch. 133, which two per cent. was imposed "for the purpose of providing the amount of compensation," &c.

4. And we also say that these acts were not embraced within the act of 1849, ch. 354, because this act does not *revive* what had *expired,* but only *continues* what then *existed* : the acts of 1828, and their supplements, were to last *until* the year 1850;" that is they expired with the year 1849, and the act of 1849, did not pass until 7th March 1850.

5. As to the anticipated mischief, &c., this is not for the court to consider, but for the legislature.

*Appellee's third point.* The object for which the tax was intended having ceased to exist, and the office of the officer appointed to collect having expired, the tax ceased,. and cannot now be collected.

Under this point we will reply to the appellant's fourth point.

The court is at an end, there are no such judges, and there is no such clerk, as the said acts of Assembly speak of. New constitution, art. 10, secs. 3 and 8. It was intended as compensation for acts *to be performed,* and no such right vested, as is referred to in section 7. The clerk's bond would not be liable for what he might do, or omit to do, after the expiration of his term of office.

Suppose that during the existence of the late court, one of the three judges had died, after a sale had been reported by a trustee and ratified *nisi,* but before final ratification, would it be considered that his administrator had a vested right to a part of the fees, because the case was in *progress* when he died.

In reply to the objection that this point was not made by exception below, we say, that it is necessarily involved and

included, in the second part of first exception, at page 6 of the record; and was discussed and decided in the court below, as appears on the face of the record, pages 8, 9 and 10.

2 *G. & J.*, 467, *Wells vs. Beall.* 8 *G. & J.*, 37, *Miller vs. Allison.*

Further in reply to the appellant's fourth point, we say, that the case of the *State vs. Mayhew*, 2 *Gill* 497, is not applicable, there the object of the tax, and the person to collect it were in existence.

We ask for an affirmance of the judgment.

MASON J., delivered the opinion of the court.

The Court of Appeals find no difficulty in disposing of the two constitutional questions presented by the record in this case. There is nothing in the act of 1841, ch. 271, repugnant either to the old or new constitution. The old constitution reposed in the legislature, the power of fixing and providing for the salaries of all judicial officers, while the new constitution determines, by its own terms, the compensation to be allowed to the judges, and provides that "the same shall not be *increased* or diminished, during the time of their continuance in office." In this respect those two instruments are wholly dissimilar. In pursuance of the powers thus vested in the legislature, under the old constitution, that body, from time to time, has passed laws imposing taxes, for the purpose of paying the salaries of the judges. No question has been raised, as to the right of the legislature to subject the fund contemplated by the act of 1841, to taxation for general purposes. The power is too clear to be disputed. But the question pressed upon us is, that when this tax is levied and collected, it cannot be applied to the increase of the salaries of the judges, because it would be granting them "fees and perquisites," in contravention of the 30th article of the bill of rights. That inhibition was designed to preserve the purity and uprightness of our judicial officers, by preventing them from receiving special compensation or gratuities, for particular services rendered, and which were more or less

to depend and be contingent upon those services. In the present case the tax having been imposed upon a legitimate subject of taxation, and it being in nowise dependent upon the action of the judge, and not to be increased or diminished, or in any way affected, by any thing he can do, it cannot be supposed to influence by possibility his judicial independence or purity, and therefore is not to be regarded as a perquisite or fee in contemplation of the constitution. A fund thus raised by taxation, can be as well applied by the legislature to the payment of the salary of a judge, as it could be to the defrayment of any other expense of government.

But in addition, it is *expressly* provided in the 52nd article of the old constitution, that no judge shall receive "any fee or reward *but what is or shall be allowed by law.*" If this fund is not appropriated to the judges "by law," we are at a loss to discover how else it can be claimed. This court therefore regards the act of 1841, as but an exercise of the power vested in the legislature, of increasing and regulating the salaries of the judges, and of providing the means of paying them.

In addition to the views already expressed on this point, it may be remarked that the constitution early underwent legislative interpretation on this subject, and we accordingly find a series of acts passed, authorising judicial officers to receive fees by way of compensation. They cover a period of nearly *seventy years*, and relate to the chancellor, judges of the general court, of the Court of Appeals, and of the county courts; and in fact, a portion of the judiciary, the magistracy for example, never received any thing but fees by way of compensation. Had we any doubt of the constitutionality of the act of 1841, this constant, long and uniform interpretation ought, certainly, to remove it.

By the new constitution it is provided, that the judges holding office under the old constitution, should continue to act in their judicial capacities until their successors should qualify. The effect of this provision was to continue their salaries, inasmuch as it continued their labors; and the State was, in the mean time, to receive the benefits of their services.

47     v. 1

The act of 1841 was designed, in part, to provide for those salaries, and was therefore not impaired by the new constitution, any more than any other of the revenue laws. The salaries provided for by the new constitution, were intended to relate to the judges chosen under that system, and not to the old officers, whose terms of service expired with the qualification of their successors. *They* continued "to hold and exercise their offices, according to their present tenure," which clearly embraced their present salaries. If, therefore, one part of their compensation, the fruits of the act of 1841, be taken away from them by the new constitution, their entire salary would share the same fate: and they would thus be required to labor from the 4th July to 1st December, without remuneration. Such a construction cannot be given to the new constitution.

We adopt the views of the court of common pleas in regard to the effect of the act of 1849, chap. 354. This will render any consideration of the question touching the permanency of the act of 1841, chap. 271, unimportant. Admitting that act to have expired, as is contended by the appellees, on the 1st January 1850, it is the opinion of this court, that it was revived, or re-enacted, by the act of 1849, chap. 354. The title of the last named act clearly indicates a purpose to continue in force the acts to which the act of 1841 was supplemental, because it purports to be "an act to continue in force such acts as would expire *during* the present session." Although the title of an act is not a part of the enacting portion of the law, yet, by an established rule of construction, it is always to be resorted to, as throwing light, as to the intention of the legislature, upon doubtful and uncertain language used in the body of the law. There is nothing in the enacting part of this law *repugnant* to the language in the title, and it may therefore be taken, as explaining the meaning of the law which, without such explanation, might be ambiguous. We may then safely give to the term "with," which in some connections, is rather an indefinite expression, the same meaning which belongs to the word "during," used in the title; and

Bradford *vs.* Jones.

as the act of 1841 expired *during that session*, it was clearly embraced within the purview of the reviving statute. The law not only *"continues in force"* previous expiring acts, but actually *"re-enacts"* them, which is certainly broad enough to embrace the law in question. The act of 1841 provides, "that there shall be, and is hereby imposed on all moneys thereafter to be deposited in Baltimore county court, or coming into the hands of trustees, or other officers of said court, or persons, for distribution, under its orders and authority, the sum of one per centum, and to be paid over to the clerk of said court," &c. Under previous enactments, the sums thus to be collected goes to the judges of Baltimore county court, as part of their compensation. At the time the tax contemplated by the act of 1841 accrued, the services of the judges had been rendered which it was designed to remunerate, and therefore the claim to it had become a vested right. In the language of this court, in the case of the *State vs. Mayhew*, 2 *Gill*, 498, this was a "legislative levy" upon the fund in question—fixed and determined beyond all contingency, before the judges went out of office; and the mere delay to have an account stated by the auditor, or to pay the amount over to the clerk, cannot in any way impair their right to the tax.

The seventh section of the tenth article of the new constitution, provides, that "all rights vested, and all liabilities incurred, shall remain as if this constitution had not been adopted." Apart from this, the same question, in principle, has been decided by the Supreme Court of the United States, in the case of *Shore vs. Jones*, 1 *Brockenborough*, 298, and 1 *Wheat.*, 474. In that case the question was presented, whether the representative of the person who was surveyor of that port at the time of the seizure, under the embargo act of Congress, was entitled to a portion of the money resulting from the condemnation, or, whether it was to go to his successor in office, at the time of the condemnation? The court held, "that the right of the collector to forfeiture in rem, attaches on seizure, and to personal penalties on suits brought; and in each case it is

ascertained and consummated by the judgment, and it is wholly immaterial whether the collector die before or after judgment. And they are further of opinion, that the case of the surveyor is not in this respect distinguishable, in any manner, from that of the collector. We are therefore of opinion, that the representatives of the deceased collector and surveyor, and not the present incumbents in office, are entitled to the distributive shares of the moiety." The present case is analagous to the cases of forfeiture alluded to. By the common law, if a party be entitled to a share of a thing forfeited, his right relates back to the time of the seizure. In the present case the services had been rendered, and the fund out of which those services were to be compensated, was fixed and ascertained, and had thereby become liable to taxation under the law. What more could be necessary to consummate the right of the party who had been designated as the recipient of it?

We do not think the objection of the appellant's counsel, well taken, that the point we have last been considering is not properly before this court, because it was not embraced in the appellee's exceptions, nor certified by the court below, as one of the points raised in that court, as required by the 4th section of the act of 1849, chap. 88. We think in all cases where points are raised by exceptions, and by means of an opinion of the court filed in the case, it would be a sufficient statement of the points in contemplation of the act of 1849. The manifest design of that law was to require the inferior court to present distinctly those questions only which were considered below, and to confine the appellate court, in the revision of the cases, to those points. It would seem to us that no better mode of presenting those questions could be suggested, than by means of an opinion; and when thus presented, there could be no possible necessity of repeating them after the appeal had been taken.

The same views apply to the question, whether any right vested in the clerk of Baltimore county court under the act of 1841, chap. 271, to collect the fund in controversy? The consideration of this particular point was involved in the views

expressed by the court below, and we therefore feel ourselves called upon to dispose of the questions on the appeal now before us. Although it is a question which concludes the present case, it is nevertheless one which does not materially affect the merits of the more important matters of controversy growing out of the construction of the act of 1841.

The case of the clerk is unlike that of the judges, as respects the tax in question. The judges are to be regarded as having rendered the services for which the tax was designed to compensate, at the time it accrued; and as soon as the tax did accrue, the right of the judges to the same attached. But not so with the clerk. Under the law, he is but a ministerial officer of the government, designated to correct and disburse a particular fund. No officer can be said to have a vested right to perform *any particular service*, so as to secure the compensation for that service; but he may well claim, as a vested right, the compensation after the service has been rendered, or after the obligation or liability to perform it has become fixed. What is the service to be rendered by the clerk under this act? It is, to collect and disburse the tax which it imposes. This service was clearly not rendered, because the tax was never collected. The next question to be considered is, had the obligation of the clerk to collect this tax, become so fixed at the time he went out of office, as to render his bond liable for an omission to do so? We think not. At what moment of time could the clerk legally have demanded the payment of this tax from the trustee? It has been argued, that his right to collect this tax, accrued as soon as the right of the judges to the same, became fixed and vested. We are of a different opinion. This fund, it will readily be admitted might have been either diminished or increased by the subsequent proceedings of the court, after the *nisi* affirmance of the auditor's report. It might be shown that the property claimed and reported as the insolvent's, was not in fact his: while on the other hand, creditors might show that more was really due the estate, than had been reported by the trustee. In either event it would be impossible to fix,

with certainty, the tax due the clerk, previous to the final rati-fication of the auditor's report. Not till then could the clerk demand, nor would the trustee be warranted, in paying over the fund. Previous to the final ratification of the auditor's account, if the trustee pays out money in his hands, he would do so at his own risk; after the ratification, he would be pro-tected in doing so. Before the final ratification in the present case, the official existence of the appellant had expired.

The principles established in *Jones vs. Shore,* 1 *Wheat.,* 462, do not apply to the claim of the clerk in this case. While it is true, that as soon as the tax accrued by analogy to a case of forfeiture, the right of the judges to the same, became fixed by the final ratification of the auditor's report, and re-lated back to the time of the accruing of the tax, it neverthe-less does not follow, that the right of the clerk to collect it, was also established at that time. In *Jones vs. Shore,* the court base the right of the collector and surveyor to the for-feiture, upon the ground that the seizure had been made, and the risks and responsibilities incurred by those officers, al-though the penalty may not have been determined, but was uncertain and contingent. It was notwithstanding, the court say, *an inchoate right acquired by the seizure,* which is con-summated by the decree of condemnation, and when so con-summated relates back to the time of the seizure. Now what has the clerk done, to give him *an inchoate right* to commis-sions for collecting this tax? Nothing, that we can see or imagine.

We are strengthened in the views we have expressed, by the provisions of the new constitution, which we think clearly points out the officer upon whom this duty devolves. By the sixteenth section of the fourth article of the constitution it is provided, that "the clerks of the court of common pleas, the superior court and the criminal court of Baltimore city, shall perform all the duties heretofore vested in the clerks of Balti-more county court, and Baltimore city court respectively, and be entitled to all the fees now allowed by law; and all laws' relating to the clerks of Baltimore county and city courts, shall

be applicable to the clerks, respectively, of the court of common pleas, the superior court, and the criminal court of Baltimore city." Under the new constitution, the cases formerly in Baltimore county court, out of which this tax and others of like kind accrued, are distributed between, and have passed to, the circuit court of the county, the superior court and the court of common pleas of Baltimore city; and by the section of the constitution just cited, the clerks of the new courts are bound to perform the duties of the late clerk of Baltimore county court, in regard to the collection and disbursement of such taxes. In the case before us, the clerk of the court of common pleas is the appropriate officer for that purpose.

The official character of the clerk of Baltimore county court having ceased at the time the audit was made in this case, we think the court below were right in rejecting the allowance made to him by the auditor. With the view, however, of enabling the auditor to restate the account, and to charge this tax in favor of the clerk of the court of common pleas, we will remand the cause, but without affirming or reversing the order, or judgment of the court below, and we will pass an order accordingly.

Cause remanded under the act of 1849, ch. 88, with costs in this court to be paid by the appellant.

*Cause remanded.*

Some days after the decision of the case, the appellee made an application for a rehearing.

The appellees in this case, pray the court to open the judgment pronounced at the present term, and re-hear the case:

1st. Because the views of the appellees were not fully presented to this court, or understood by their honors, the judges, at the former trial.

2nd. Because this court has not in its opinion filed, ruled and determined the whole case and matter in controversy, as shown by the whole record.

3rd. And because particularly this court has not determined, when the right to the tax referred to, did vest in the judges.

*Mr. Scott,* in behalf of the applicants.

The court does not say when the right vested. Proceedings commenced in 1836, when judges Archer and Magruder were on the bench. Both of them are since dead, and others supply their places. It is important to have this settled.

Thereupon the court, by MASON J., expressed the following opinion, overruling the motion.

The only matter presented to the court for adjudication in this cause, was, whether the estate of Jones, the insolvent, was to be reduced, by the imposition of the tax, provided for under the act of 1841, chap. 271?

We expressly decided that question, and have directed that the auditor, under the control of the court, shall allow the tax, in the name of the clerk of the court of common pleas. This done, the present controversy is ended, and all control of the court over the subject matter ceases.

The points involved in the present controversy, as presented by the record, have been fully argued, considered and decided, and need not be again opened for the purpose of letting in new matters of dispute, not raised by the present record.

As a reason why this case should be re-opened and argued anew, it has been alleged, that in order to determine who were entitled to the fund, as between the judges, who were in office, at the time the new constitution went into operation, and the representatives of those who preceded them, it was necessary, that the court should have fixed the time when the tax in question vested. The reasons thus assigned, why we should fix the time, constitutes the best ground, in our judgment, why we *should not do so.* If we were to settle this question, we would be virtually deciding upon the rights and interests of parties not before the court. The late judges of Baltimore county court, are in no way parties to this proceeding. If there should be any conflict between them, as to their right to this fund, they ought to be before the court, and heard, before any action upon their interests could be taken.

*Motion overruled.*